NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200361-U

NO. 4-20-0361

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Douglas County |
| WILLIAM B. THOMPSON, | ) | No. 07CF92 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Gary A. Webber, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: Postconviction counsel's certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) raises a presumption of reasonable assistance, which is unrebutted.

¶ 2    The defendant, William B. Thompson, who is serving a sentence of natural life imprisonment for first degree murder (720 ILCS 5/9-1(a)(1), (b)(1) (West 2006); 730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2006)), appeals from the second-stage dismissal of his petition for postconviction relief. See *People v. Harris*, 2013 IL App (1st) 111351, ¶¶ 46-47 (describing the three stages of a postconviction proceeding). In his view, the record fails to show that postconviction counsel substantially complied with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), a rule designed to ensure that defendants receive a reasonable level of assistance from their postconviction counsel. In our *de novo* review, we conclude that (1) the Rule 651(c)

certificate filed by postconviction counsel raises a presumption of reasonable assistance and (2) defendant fails to rebut that presumption. Therefore, we affirm the judgment.

¶ 3                                    I. BACKGROUND

¶ 4          On March 11, 2009, defendant appeared with this attorney and proposed that, in return for a sentence of natural-life imprisonment, he would plead guilty to count I of the amended information. Count I charged that on June 21, 2007, defendant committed first degree murder (720 ILCS 5/9-1(a)(1), (b)(1) (West 2006)) in that he "or one [for] whose conduct he [was] accountable, fired gunshots in the direction of the driver's side window of a police vehicle, at a time when Tommy Martin was driving said vehicle, thereby causing the death of Tommy Martin." "[F]or sentencing purposes," count I added that, at the time of the incident, Martin "was a peace officer in the course of performing his official duties" and that defendant "knew or should have known that the murdered individual was a peace officer." See 730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2006).

¶ 5          In response to questions from the circuit court, defendant said he understood count I, including the sentence-enhancing factor. He also said he understood that the sentencing range for first degree murder was imprisonment for not less than 20 years and not more than 60 years and that the extended range of imprisonment was not less than 60 years and not more than 100 years. The court confirmed with defense counsel and the prosecutor that natural-life imprisonment would be mandatory if, in a trial, defendant were found to have known that Martin was a peace officer acting in the course of his official duties. Defendant said he understood that a unanimous verdict was required for the imposition of a natural-life sentence. He further said he understood that if he declined the plea agreement, proceeded to trial, and were found guilty, he could be sentenced to death. He said he understood that he would have a right to a jury in the death-sentencing hearing and that a death verdict would have to be unanimous before the death

penalty could be imposed. He said he understood that the sentencing judge would be obligated to impose a natural-life sentence if the sentencing jury declined to impose the death penalty. Defense counsel stated, on the record, that he had explained to defendant that if he were found guilty of murdering a police officer "the only two possible sentences would be death or life imprisonment." Defendant said he wanted to give up his right to trial and to plead guilty to first degree murder.

¶ 6    The State presented the following factual basis for the proposed guilty plea:

"If this cause were to proceed to trial, Your Honor, the State would be able to prove the following facts which would support a conviction of the above—of this defendant, William B. Thompson, of the crime of first-degree murder, the mandated sentence for which is natural life imprisonment.

The evidence would show that at about 10:40 a.m. on June 21, 2007, Tommy Martin was the Chief Deputy Sheriff of Douglas County, a uniformed peace officer in the course of performing his official duties.

That earlier that morning at about 9:03 a.m., Trooper Brian Wood of the Illinois State Police effected a traffic stop on Interstate 57 in the southbound lanes in Douglas County, Illinois, of a tan or silver four-door Infinity motor vehicle for a violation of the Illinois Vehicle Code.

That the driver of this Infinity was identified, and would be identified as the defendant, William B. Thompson, date of birth, August 2, 1980, this defendant. The passenger was subsequently identified as Yusef Kareem Brown. The Infinity was registered to Arnie L. Graves of Chicago, Illinois.

During the course of this traffic stop, a State Police canine performed a 'free air' sniff of the Infinity and indicated the odor of cannabis or controlled substances.

That the defendant and Mr. Brown were instructed to exit the motor vehicle. The defendant and Brown refused to exit and fled the stop in the Infinity at about 9:17 a.m., proceeding southbound on Interstate 57. It was later determined that at about 1:00 a.m. earlier that day, the owner of this vehicle, Arnie L. Graves, was murdered by gunshot and hammer blows to the head in his apartment in Chicago. It was later determined that the defendant, William Thompson, knew Arnie Graves and that he had been with Arnie Graves the evening before the murder.

That some time between 10 o'clock and 10:29 a.m. on the 21st at a residence located at 1540 East County Road 1250 North outside of Villa Grove in Douglas County, Illinois, Betsy Orwick, Jeremy Shunk and Ryan Riddell were robbed and tied up by two armed gunmen, that Shunk and Orwick at trial would identify as the defendant and Yusef Brown. They would testify that the defendant and Brown left Shunk in the trunk of the Infinity parked in the rear of the property, at that time the home of Ryan Riddell.

The defendant and Brown stole Riddell's black Chevrolet S-10 pickup and Orwick's beige Mercury van and left the residence. That Orwick shortly thereafter freed herself and called 911 at 10:29 a.m. to report the home invasion and robbery.

That Tommy Martin, among other law enforcement officers, proceeded towards that location in a police vehicle. Mr. Martin was travelling north on Prairie Street out of Tuscola, turning east on County Road 1250 North, also known as the Hayes Road, towards the Riddell residence.

That at 10:40 a.m. Martin advised dispatch that he had sighted the Mercury van and the black S-10.

- 4 -

That at 10:41 a.m. Martin advised dispatch that he had been shot.

That shortly—that at a subsequent time from his hospital bed, Martin gave a recorded statement describing that he had been shot by a black male driving the black S-10 pickup.

That shortly thereafter, the beige Mercury was sighted by State Troopers headed northbound on Route 45 from the Hayes Road. Pursuit was then initiated until the van stopped at the intersection of Route 45 and Route 133 in Arcola, Illinois. The black S-10 was found abandoned at the intersection of the Hayes Road and Route 45.

That during the pursuit of the Mercury van, the police car operated by Trooper Mike Sturgeon was hit by gunshots fired from the Mercury van. Trooper Sturgeon later recovered the projectiles from his back seat and they were turned into the State Crime Lab.

That the Mercury van came to a stop at the intersection of Route 133 and Route 45 in Arcola. This defendant ran from the passenger side of the van and into the nearby First Mid Illinois Bank. Brown was apprehended from the driver seat of that van.

That the defendant, brandishing a Smith & Wesson 9-millimeter semiautomatic pistol, then held the bank employees hostage during the standoff with the police, eventually surrendering at the end of this day.

That Martin was taken to Carle Foundation Hospital where he was treated for the gunshot wounds to his face and chest. The gunshot projectile in his chest went through his lung and lodged in his spine. After surgery and intubation, Martin

regained consciousness only briefly during the next few weeks. In the beginning of July, Martin's diverticulum perforated, sepsis set in, causing massive organ failure and Martin died on July 17, 2007.

Firearm projectiles recovered from Martin and the projectiles recovered from Trooper Sturgeon's vehicle were analyzed by the State Police Crime Lab, who determined to a reasonable degree of scientific certainty that these projectiles were fired from the same 9-millimeter pistol possessed by the defendant during his standoff with the police at the bank in Arcola.

That the clothing the defendant was wearing on June 21, 2007, was seized following his arrest at the Arcola Bank. It was analyzed by the State Police Crime Lab. The right cuff of the shirt the defendant was wearing was found to have gunshot residue particles indicating that a firearm had been discharged in close proximity.

That the black Chevy S-10 pickup, which [*sic*] it was taken from the Riddell residence, was examined by the Illinois State Police Forensic Lab. The defendant's fingerprint was found on the driver's side door. The key to the Infinity that was registered to Arnie Graves was found on the center console of the black S-10. This key was found to have blood on it. DNA testing by the Illinois State Police show that the blood was Arnie Graves, the registered owner of the Infinity, who had been found murdered in his Chicago condominium on the 21st. The Infinity was being driven by William Thompson at the time he escaped from the Illinois State Police traffic stop on Interstate 57.

That a sock seized from the defendant on the 21st was found to contain blood. The blood was DNA tested by the Illinois State Police and found that this was also the blood of Arnie Graves."

¶ 7   The circuit court then admonished and questioned defendant further. He waived his right to a jury on the sentence-enhancing issue of whether he knew or should have known that Martin was a peace officer. Defendant said nobody had forced him to plead guilty; that, outside the plea agreement, no promises had been made in exchange for his guilty plea; and that he was satisfied with the representation he had received. He said he wanted to plead guilty of his own free will. The court found his proposed guilty plea to be knowing and voluntary, and the court accepted the guilty plea and entered judgment on it.

¶ 8   The State then presented some victim impact statements. Pursuant to the plea agreement, the circuit court sentenced defendant to natural-life imprisonment. The State moved to dismiss the remaining counts against him as well as a pending charge in Douglas County case No. 07-CF-125 that accused him of committing a crime while in jail. The court granted the motion. The court admonished him of his right to appeal. He did not take a direct appeal.

¶ 9   On December 8, 2016, however, defendant filed a *pro se* petition for postconviction relief, in which he alleged as follows:

"I was denied effective assistance of counsel when my attorney refused to interview my alleged co-defendant, Yusef b. [*sic*] Brown, regarding the fact that I did not intend; plan; agree; aid; abet, nor did I have any knowledge of the of the [*sic*] fact that Brown was going to shoot the Police Officer.

I was not in the truck with Brown when he shot the police, I was driving in front of Brown in a mini van, and after the officer was shot I stop[p]ed my vehicle

in shock (actually blocking Borow's [*sic*] vehicle from escape). I then remember [B]rown opening my driver door and pushing me to the passenger side so he could make his escape. After coming out of shock I asked Brown 'what did you shoot the police for?'

I kept telling my attorney that I was innocent, but he would not believe me, and he wouldn't interview Mr. Brown to ver[i]fy my story. He just kept saying 'if you don't plea[d] guilty you will get the death penalty.'

However, I recently received newly discovered evidence in the form of an affidavit from Yusef K. Brown supporting my claim of actual innocences [*sic*]."

¶ 10    In his affidavit, dated April 18, 2016, Yusef K. Brown averred as follows:

"On June 21 2007 I Yusef K. Brown shot a on duty police officer two times and aft[ ]er that William Thompson stop his car like he was in a state of illness or shock.

So, I jump out the black truck ran to William Thompson assist because he was blocking the truck I was in then, I Yusef Brown open the driver door to the mini van William Thompson was driving and told him to move over the passenger seat and William Thompson move and let me Yusef Brown take over the mini van. So aft[ ]er making a right turn more police started to come and then I Yusef Brown ended up on the expressway then William Thompson ask me what did I shoot the police for and I Yusef Brown solely told William Thompson I work for GOD ALLAH.

So the police officer in the cars started to get closer to the mini van. So, I Yusef Brown got off the Expressway with a lead and that's when I threw the gloves

- 8 -

I was wearing out the window and 100 more feet I crash the car and that[']s when I Yusef Brown told William Thompson to run and get to safety because the police was going to shoot to kill.

I Yusef Brown stop that by surrend[er]ing to the down coming police cars."

¶ 11 On May 5, 2017, the circuit court docketed the *pro se* petition for second-stage proceedings and appointed counsel.

¶ 12 On September 12, 2017, in a status hearing, postconviction counsel told the circuit court:

"Judge, I would indicate that after we were here last time and Mr. Thompson was present I had a chance to speak to Mr. Thompson. He indicated to me at that time there wasn't any additional claims that he wanted to make. The claim he has made, which he put in his *pro se* Petition, is very straightforward, and I think, easily understood. I don't see a point in trying to amend that. [The prosecutor] has furnished me with—certainly not all the discovery in this lengthy case—but I think a sufficient amount of relevant discovery that I have had a chance to review that and kind of know what the circumstances were.

I don't think there is a need to make an amendment to the petition or the other paperwork that Mr. Thompson filed."

¶ 13 On the grounds of untimeliness and a failure to make out a legally sufficient claim of actual innocence, the State moved to dismiss the *pro se* petition. On January 9, 2018, the circuit court held a hearing on the motion for dismissal. After the attorneys made their arguments, the court granted the State's motion, for three reasons. First, the petition was not filed within three years after the conviction—the statutory period of limitation for claims other than those of actual

- 9 -

innocence, including claims of ineffective assistance of counsel. See 725 ILCS 5/122-1(c) (West 2016). Second, the petition failed to show that defendant was actually innocent. The court explained, "I do not believe that this raises a cognizable claim of actual innocence. It may merely change who actually pulled the trigger and does not in and of itself raise a claim that he couldn't be held accountable for that action regardless of who pulled the trigger." Third, the court was unconvinced that Brown's affidavit was new evidence that, in the exercise of reasonable diligence, would have been undiscoverable earlier—a requirement for claims of actual innocence. The court noted "sufficient evidence in the record that there were extensive amounts of interview time of this Co-Defendant, Yusef Brown, which [defendant] had access to." "But even so," the court added, "this statement in and of itself does not raise a cognizable claim of innocence such that I should excuse the late filing." Therefore, the court granted the State's motion to dismiss the *pro se* petition for postconviction relief.

¶ 14        Defendant appealed. On January 6, 2020, by summary order, we remanded the case for compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), because the record, including the Rule 651(c) certificate, failed to show that postconviction counsel had examined the transcripts of the guilty plea proceedings. *People v. Thompson*, No. 4-18-0081 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 15        On remand, postconviction counsel filed a new Rule 651(c) certificate, which read as follows:

> "1. I was appointed by the Court to represent Defendant on a *pro se* post-conviction petition.
>
> 2. I met personally with Defendant and discussed his post-conviction petition.

3. I was provided by the Douglas County Circuit Clerk with the common law record of proceedings in the above cause which I examined to the extent I deemed necessary to understand Defendant's post-conviction petition and earlier proceedings in this case. Further I was furnished with a transcript of proceedings which included a transcript of Defendant's guilty plea.

4. After the above review I determined that no amendment of Defendant's post-conviction petition was necessary to understand his claimed constitutional violations."

¶ 16 Defendant again appeals, maintaining that the record still fails to show substantial compliance with Rule 651(c).

¶ 17 II. ANALYSIS

¶ 18 A. The Capital Ineligibility of Defendants Who
Were Guilty Only on a Theory of Accountability

¶ 19 Under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), the record must "contain a showing, which may be made by the certificate of" the appointed postconviction attorney, that the attorney has discharged certain duties. One such duty is to "ma[k]e any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of [the] petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). We decide *de novo*, that is, without any deference to the circuit court's decision (*People v. Johnson*, 2021 IL 125738, ¶ 28), whether the record shows compliance with Rule 651(c). See *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 20 "The filing of a Rule 651(c) certificate gives rise to a presumption that postconviction counsel provided reasonable assistance during second-stage proceedings under the

Act." *People v. Jones*, 2011 IL App (1st) 092529, ¶ 23; see also *Suarez*, 224 Ill. 2d at 42 (holding that petitioners are entitled to a reasonable level of assistance from postconviction counsel). "It falls on the defendant to overcome that presumption by demonstrating counsel's failure to substantially comply with the duties mandated by Rule 651(c)." *Jones*, 2011 IL App (1st) 092529, ¶ 23.

¶ 21       With respect to amendments, the duty of postconviction counsel, again, is to "ma[k]e any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of *petitioner's* contentions." (Emphasis added.) Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Rule 651(d) requires postconviction counsel to amend the *pro se* petition only to perfect the claims already set forth (imperfectly) in the *pro se* petition. See *People v. Pendleton*, 223 Ill. 2d 458, 475-76 (2006). Postconviction counsel has to read the *pro se* petition, ascertain the claims that the defendant intended to assert therein, and make whatever nonfrivolous amendments are necessary for an adequate presentation of the defendant's claims. Because a reasonable level of assistance is what postconviction counsel owes the defendant (see *Suarez*, 224 Ill. 2d at 42), postconviction counsel's interpretation of the *pro se* petition must be reasonable. If, from the text of the *pro se* petition, the defendant's intention to assert a particular claim would be discernable to a reasonable reader, postconviction counsel is expected to discern that claim and to make whatever amendments to the petition are necessary to present that claim correctly and completely.

¶ 22       This was defendant's *pro se* claim, to quote from his brief: "In his *pro se* petition, [defendant] alleged he was actually innocent based on an affidavit from his co-defendant, Yusef Brown, and that trial counsel was ineffective for failing to interview Brown before trial." Defendant admits that his "*pro se* claim of innocence ultimately fails because [he] could have been culpable for the murder even if Brown were the actual shooter, under a theory of accountability."

Nevertheless, defendant contends that "the allegations and affidavits of [his] *pro se* pleading also support a cognizable claim that his 2009 guilty plea was involuntary." By failing to interview Brown, defendant argues, plea counsel failed to discover that he could be found guilty of Martin's murder only on a theory of accountability. The severest penalty that defendant could have received on a theory of accountability was life imprisonment, not death. See 720 ILCS 5/9-1(b)(6)(a)(i), (15) (West 2006); see also *Enmund v. Florida*, 458 U.S. 782, 797, 801 (1982). By falsely advising him that if he went to trial and were found guilty, he could be sentenced to death, plea counsel rendered ineffective assistance, defendant argues, making his guilty plea involuntary.

¶ 23    The trouble is, nowhere in his *pro se* petition for postconviction relief does defendant claim that his guilty plea was involuntary, let alone that it was involuntary because of plea counsel's failure to advise him of the capital ineligibility of someone who was guilty merely by accountability. To be sure, defendant alleges in his *pro se* petition that plea counsel "kept on saying[,] '[I]f you don't plea[d] guilty[,] you will get the death penalty.' " According to the *pro se* petition, however, what made that advice unreasonable was that defendant was *actually innocent*— as, supposedly, plea counsel would have discovered by interviewing Brown—not that defendant was *guilty by accountability*. Defendant expects of his postconviction counsel a strained reading of the *pro se* petition that goes beyond reasonableness. Defendant "interprets" into existence a new claim that is not reasonably discernable from the text of his *pro se* petition.

¶ 24    In sum, a postconviction counsel's duty of amendment under Rule 651(c) is limited to the claims the defendant already has made, incompletely or imperfectly, in the *pro se* petition. See *Pendleton*, 223 Ill. 2d at 475-76; *People v. Richardson*, 382 Ill. App. 3d 248, 258 (2008). In his *pro se* petition, defendant never claimed that his guilty plea was involuntary, let alone that it was involuntary because of plea counsel's neglect to advise him that defendants guilty of murder

- 13 -

only on a theory of accountability were ineligible for the death penalty. Instead, his *pro se* claim was that by failing to interview Brown, plea counsel failed to discover that defendant was actually innocent of murder and that, *because of his actual innocence of murder*, he was ineligible for the death penalty (or any punishment at all). The *pro se* petition cannot be plausibly interpreted as intending to assert the claim that defendant asserts now. Consequently, he fails to rebut the presumption that postconviction counsel "made any amendments to the petition[ ] filed *pro se* that [were] necessary for an adequate presentation of [the] petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017); see also *Jones*, 2011 IL App (1st) 092529, ¶ 23.

¶ 25                                    B. Time Limitation

¶ 26          Defendant took no direct appeal from his conviction and sentence. Section 122-1(c) of the Act provides that "[i]f a defendant does not file a direct appeal, the post-conviction petition shall be filed no later than 3 years from the date of conviction, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2016). But the statute adds, "This limitation does not apply to a petition advancing a claim of actual innocence." *Id.* Thus, although defendant's claim of actual innocence would not be subject to the three-year limitation, his claim of ineffective assistance would be subject to the limitation—unless his petition alleged facts showing that the delay was not due to his culpable negligence. See *id.* Defendant criticizes his postconviction counsel for failing to amend the *pro se* petition so as to allege facts showing that defendant's delay in bringing his ineffective-assistance-of-counsel claim was not due to his culpable negligence. See *People v. Perkins*, 229 Ill. 2d 34, 44 (2007) (explaining that "[a]n adequate or proper presentation of a petitioner's substantive claims necessarily includes attempting to overcome procedural bars, including timeliness, that will result in dismissal of a petition if not rebutted").

¶ 27 The claim of ineffective assistance, however, was premised on the claim of actual innocence. According to the *pro se* petition, plea counsel rendered ineffective assistance by failing to interview Brown and, as a consequence, failing to discover the evidence of defendant's actual innocence of Martin's murder. As defendant admits in his brief, however, his "*pro se* claim of innocence ultimately fails because defendant could have been culpable for the murder even if Brown were the actual shooter, under a theory of accountability." If the premise of the ineffective assistance claim—the premise of actual innocence—fails on its merits, so does the ineffectiveness claim, regardless of whether it could be shown to be timely. Therefore, we need not reach the question of whether postconviction counsel should have amended the *pro se* petition so as to show an absence of culpable negligence in waiting more than three years to raise the ineffectiveness claim. In any event, the theory of ineffective assistance propounded by the *pro se* petition is substantively deficient, resting as it does on the misguided theory of actual innocence.

¶ 28 C. Meeting With Defendant to Ascertain His Constitutional Claims

¶ 29 Another showing the record must make—a showing that likewise may be made by a Rule 651(c) certificate—is that "the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Defendant contends that although the new Rule 651(c) certificate states that the attorney "met personally" with defendant and "discussed his post-conviction petition," the certificate fails to specify that the attorney "attempted to ascertain the factual basis underlying defendant's constitutional claims during this discussion." But Rule 651(c) says nothing about "factual bases." Instead, Rule 651(c) requires the postconviction counsel to "consult[ ] with" the defendant "to ascertain his or her contentions of deprivation of constitutional rights." Such contentions are in the *pro se* petition, and according to the Rule 651(c)

- 15 -

certificate, postconviction counsel met with defendant and discussed the petition. Also, postconviction counsel told the circuit court, "I had a chance to speak to [defendant]. He indicated to me at that time there wasn't any additional claims that he wanted to make." Therefore, we find substantial compliance with Rule 651(c). See *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18 (noting that "[s]ubstantial compliance with Rule 651(c) is sufficient.").

¶ 30                                III. CONCLUSION

¶ 31            The presumption of reasonable assistance raised by the Rule 651(c) certificate is unrebutted. Therefore, we affirm the circuit court's judgment.

¶ 32            Affirmed.